UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DURELL T. CRAIN,

        Petitioner,

           v.                          CAUSE NO. 3:23CV710-PPS/JEM

WARDEN,

        Respondent.

<u>OPINION AND ORDER</u>

      Durell T. Crain was found guilty by a jury in Marion County Superior Court of kidnapping and unlawful possession of a firearm. He was sentenced as a habitual offender and a serious violent felon to 32 years of incarceration. Proceeding without a lawyer, Crain now challenges those convictions under 28 U.S.C. § 2254.

<u>Factual Background</u>

      In deciding this habeas petition, I must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here's how the Indiana Court of Appeals summarized the evidence:

> On October 9, 2016, Crain called his sixty-two-year-old cousin Freddie Hollis to find out his plans for the day. Hollis said that he was going to a friend's house south of downtown Indianapolis. Crain asked if he could go with Hollis, and Hollis agreed. Hollis drove his truck to Crain's house at 12th Street and Arlington Avenue, picked him up, and drove them to Hollis's friend's house.
>
> While there, Hollis observed that Crain appeared intoxicated and started "talking crazy for no reason." Hollis was embarrassed by Crain's behavior. At one point, a gun fell out of Crain's pocket. Hollis decided it was time to leave. Hollis was upset that Crain had a gun and did not want

him to get in his truck. However, Hollis did not want to leave Crain stranded, so he allowed Crain to come with him.

As Hollis was driving, he expressed his displeasure with Crain's behavior. Crain took his gun out of his pocket and said that he was tired of Hollis "getting on his case." Hollis asked Crain, "What are you doing? You threaten me with a gun now?" Hollis pulled over and repeatedly asked Crain to get out of his truck, but Crain would not comply. Hollis continued driving but stopped again near 21st Street and Arlington Avenue and asked Crain to get out of the truck. Crain would not get out. Hollis told Crain that Hollis was going to drive to Hollis's home.

At 30th Street and Franklin Road, Crain said, "Let me out right here at the light." Hollis pulled over, but Crain still would not get out. Hollis continued to drive to his home. As they approached 36th Street and Post Road, Crain called his mother and told her, "Freddie go kill me. He goes to kill me, mom. He gonna kill me. I know he is. I know he is." Crain still had his gun out. Suddenly, Crain fired the gun. Hollis believed that he had been shot. Hollis put the truck in park and jumped out to see if he had been injured. When Hollis turned back toward the truck, he saw that Crain had "the gun pointed towards [him]" and that smoke was coming out of the barrel. Crain told Hollis, "I ain't going to your house. You take me to my mom's." Hollis got back in the truck because he was "scared for [his] life." Crain kept the gun pointed at Hollis while Hollis drove Crain to his mother's apartment.

When Hollis arrived at Crain's mother's apartment, Crain would not get out of the truck. Hollis told Crain that he was going to call 911, and Crain finally exited the vehicle. However, when Crain saw Hollis actually calling 911, Crain ran back toward the truck waving his gun. Hollis drove away and finished his 911 call at a gas station. During the investigation, police observed what appeared to be a bullet hole and bullet fragments in the dashboard of Hollis's truck. Police obtained a search warrant for Crain's home and found a firearm under the hood of a vehicle in a garage attached to Crain's house.

The State charged Crain with level 3 felony kidnapping, level 5 felony attempted battery by means of a deadly weapon, unlawful possession of a firearm by a serious violent felon, and with being an habitual offender. A jury acquitted Crain of the attempted battery charge but found him guilty of the remaining charges and of being an habitual offender. The trial court sentenced Crain to an aggregate term of thirty-two years.

*Crain v. State*, 102 N.E.3d 347 (Ind. Ct. App. 2018); ECF 15-8 at 2-4.

Crain asserts that he is entitled to habeas relief because the trial record lacked sufficient evidence to support his kidnapping conviction. He further argues that trial counsel provided ineffective assistance by failing to preserve for appeal the exclusion of his mother's testimony and the amendment to the information, by failing to retain a ballistics expert, by failing to challenge the search warrant, and by eliciting harmful testimony from Dara Chesser. I'll address each of the claims in turn below.

<u>Procedural Default</u>

Before considering the merits of a habeas petition, I must ensure that the petitioner has exhausted all available remedies in State court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the State courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). This means a petitioner is out of luck unless he argued "his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted).

On direct review, Crain presented his claim regarding insufficient evidence to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 15-5; ECF 15-9. On

post-conviction review, Crain presented each of his ineffective assistance of trial counsel claims to the Indiana Court of Appeals and squarely presented the ineffective assistance claim relating to the exclusion of his mother as a witness. ECF 15-13. However, the parties dispute whether Crain fairly presented the remaining ineffective assistance of trial counsel claims to the Indiana Supreme Court in his petition to transfer.

To the Warden's point, the petition to transfer does little more than list the remaining ineffective assistance of counsel claims and does not engage with the reasoning of the Indiana Court of Appeals on any of them. ECF 15-17. It focuses almost entirely on the claim relating to the exclusion of his mother as a witness. Nevertheless, the petition to transfer also broadly frames the question presented on a transfer as "whether [Crain] was denied ineffective assistance of counsel" and argues that the excluded witness error "together with the other four errors asserted below meets the standard for vacating Crain's conviction under *Strickland*." *Id.* at 2, 11. Further, the Indiana Supreme Court provided only a summary order denying transfer without explanation as to whether it found that the claims were procedurally defaulted or whether it determined that the merits of the claims did not warrant further examination. ECF 15-18. Given this ambiguity, I will assume without deciding that each of the ineffective assistance of trial claims were fairly presented to the State courts and consider them on their merits.[1]

---

[1] Notably, I have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

<u>Discussion</u>

Obtaining relief under the habeas statute has come to be exceedingly difficult over the years. This is because cases like *Woods v. Donald*, 135 S.Ct. 1372 (2015), have clarified that habeas relief is limited to "extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 1376 (quotations and citation omitted). This imposing standard comes directly from the habeas statute itself:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted). With these stringent standards in mind, I turn to the claims raised by Crain.

### 1. Sufficiency of the Evidence

Crain argues that he is entitled to habeas relief because the trial record lacked sufficient evidence to support his conviction for kidnapping. For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Count I of the amended indictment charged Crain with kidnapping. In particular, it alleged that Crain used a gun to forcibly move Freddie Hollis from one place to another—from the corner near 30th St. and Franklin Road to Crain's mother's house. ECF 16-5 at 141-42. On Crain's direct appeal, the Indiana Court of Appeals fully addressed this claim and denied it. ECF 15-8.

At trial, the prosecution presented Officer Mercer, who testified that, on October 9, 2016, at about 3:00 p.m., he was dispatched to a BP gas station at 30th and Mitthoeffer Road based on a report that shots had been fired in a vehicle. ECF 16-2 at 36-55. Upon arriving, he encountered a black male standing near a Toyota truck, who identified himself as Freddie Hollis, the victim. *Id.* The victim appeared panicked, afraid, and nervous and told him that Crain had shot at him. *Id.* When Officer Mercer examined the truck, he saw that the speedometer area of the dashboard has been shot and found

6

bullet fragments inside the plastic cover. *Id.* The victim described the firearm as a shiny

chrome .38 revolver. *Id.*

The victim testified that, on October 9, 2016, at about 11:00 a.m., he had planned

to visit his friend Darnell Ford because Ford had been sick with cancer. *Id.* at 59-77.

Around that time, he received a telephone call from Crain, his 33-year-old cousin, who

asked what the victim was doing and whether he could go with him. *Id.* The victim

agreed and picked Crain up at his residence at 12th and Arlington, and they went to

visit Ford. *Id.* At Ford's house, the victim suspected that Crain was drunk because he

had a can of beer and because of the way he was speaking. *Id.* As the victim left the

Ford residence, a pistol fell from Crain's pocket, and the victim recognized it as the

shiny chrome .38 from his prior interactions with Crain. *Id.* The presence of the pistol

embarrassed the victim and also upset him because he did not allow Crain to ride in his

truck with a gun. *Id.* Though reluctant, the victim allowed Crain to ride in his truck to

go home due to the distance between Ford's house and Crain's house. *Id.* That's when

things took a turn for the worse.

As the victim drove east on I-70, Crain removed the gun from his pocket and

placed both of his hands on it. *Id.* He told the victim that "he was tired of hearing [him]

talking about what he did." *Id.* He said that "he's a gangster, he's a G" and "he ain't

gotta hear all this talk." *Id.* The victim asked Crain, "What you doing? You threaten me

with a gun now?" *Id.* While still on I-70, the victim pulled over and asked Crain to exit

the truck, but Crain refused. *Id.* At 21st and Arlington, the victim asked Crain to exit the

truck again, but Crain again refused and ordered the victim to drive him home. *Id.* The

victim then told Crain that he was driving to his own house instead. *Id.* Crain then asked to be let out at 30th and Franklin Road, but when the victim pulled over, Crain would not get out. *Id.*

When the victim stopped at a turn near his house, Crain called his mother and said, "Freddie go kill me. He goes to kill me, mom. He gonna kill me. I know he is, I know he is." *Id.* Crain had his gun out and fired it, and smoke was coming from the barrel. *Id.* The victim parked the truck in the middle of Post Road and checked himself to see if he had been shot. *Id.* Crain pointed the gun at the victim and said, "I ain't going to your house. You take me to my mom's." *Id.* The victim complied because he was "scared for [his] life." *Id.* Crain pointed the gun at him as he drove to Crain's mother's house. *Id.*

Crain's mother stood in her doorway as the victim drove up. *Id.* Crain continued to refuse to leave the truck but finally exited after the victim told him that he was calling 911. *Id.* When Crain observed the victim calling 911, he ran toward the truck waving the gun, and the victim drove away from the apartment building. *Id.* He parked at a gas station nearby and completed his 911 call, and a recording of the call was admitted into evidence. *Id.* He also met the responding officer at the gas station. *Id.* Later that day, the victim met with a detective at the police station and identified Crain as his assailant. *Id.*

Officer McWhorter testified that, on October 9, 2016, at about 6:53 p.m., he responded to a "shots fired" report at the house at 6204 East 12th Street. *Id.* at 104-124. This second 911 call was also admitted into evidence. *Id.* Officers surrounded the house

and made loud announcements to see if anyone was inside. *Id.* Crain came out of the house minutes later with an African American woman behind him. *Id.* Thereafter, Detective Hale arrived on the scene with a search warrant. *Id.* After speaking with the woman, he went directly to the garage and discovered a handgun in the hood of a maroon vehicle. The handgun contained three live rounds. *Id.* Detective Hale largely corroborated Officer McWhorter's story.

On direct appeal, Crain argued that the trial record contained insufficient evidence to find him guilty of kidnapping. ECF 15-5. The Indiana Court of Appeals rejected this claim, reasoning that based on the victim's testimony the jury could have reasonably found that Crain knowingly or intentionally used force or the threat of force to remove the victim to a different location. ECF 15-8. The appellate court declined to reweigh the evidence. *Id.*

After reviewing the record, I cannot find that the State court made an unreasonable determination on the sufficiency of the evidence claim. The victim testified that Crain pointed the handgun at the victim, shot a bullet in his truck in his direction, and commanded the victim to drive him to his mother's home. Viewed in the light most favorable to the prosecution, this testimony alone satisfies the elements of kidnapping – that Crain intentionally used the threat of the handgun to move the victim from one location to another. Given the absence of any conflicting evidence, a jury could have rationally credited the victim's testimony and found Crain guilty of kidnapping. Consequently, the insufficiency of the evidence claim is a nonstarter.

2.    **Ineffective Assistance of Trial Counsel – Margaret Gilbert**

Crain argues that trial counsel provided ineffective assistance by failing to make an offer of proof when the trial court excluded Margaret Gilbert, his mother, as a witness. Crain maintains that the failure to make an offer of proof waived the issue for purposes for appeal.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now

10

whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

According to the probable cause affidavit, Officer Mercer had the following conversation with Crain's mother immediately after speaking with the victim at the gas station:

> Ms. Gilbert stated that she was on the phone with Crain during a portion of the incident while Mr. Hollis and Crain were in the car together. Ms. Gilbert stated that she heard the two arguing and yelling at each other and heard a voice say, "I'm about to kill you." Ms. Gilbert stated that Crain was attempting to get into her apartment building after Mr. Hollis dropped him off at her home. Ms. Gilbert stated that she refused to allow Crain inside of her home because she could tell that he was drunk. Ms. Gilbert stated that Crain has no control over himself when he drinks alcohol. Ms. Gilbert stated that she transported Crain to his home located at 6204 E. 12th Street to avoid further altercation.

ECF 16-5 at 16-18.

Crain's mother also met with Detective Hale and provided the following statements:

> **Gilbert:** I was at home and my phone rung. It was my son and he had called me crying and he said that he was with my cousin Freddie and they were into it and so I heard my cousin Freddie in the background saying I'm going to kill this n****. I'm going to shoot him, I'm going to kill him, and so my son was crying and then the phone hung up. We got disconnected, so I was trying to call my son back, and it kept going to the voicemail. So then my son end up calling me back and he was crying still and he said he was out in front of my house so I opened the door. I came out front so my son was getting out of the truck. My cousin's black truck and so then my son came inside the door. So my cousin was kind of like pulling off a little bit so I ran in the house and I got my keys and my son had been drinking. I knew my daughter and my son-in-law was on their way over so I didn't want them to be around that because my son had been drinking and all of that. So I told my son I said I'm going to take you

home and you get yourself together, so I dropped him off. So well when I was in the hallway watching my son get off I had called my mother and I told my mother to call the police because I don't trust…. nobody in my family trusts my cousin Freddie….

* * *

**Gilbert:** I know he was trouble so I told my mother to call 911 so after I had seen he had pulled off I told my son I said come on. I said I'm getting ready to drop you off at home because I don't want this at my house so I dropped my son off at home. But on the way dropping him off, I tried to call my mom and tell her to just cancel 911, I was taking my son home.

* * *

**Detective Hale:** And where did you pick your son up at?

**Gilbert:** My son was here. Freddie dropped my son off here at my house.

**Detective Hale:** Okay.

**Gilbert:** So then once I saw my son had been drinking and barely could stand up, I told him, I said I'm going to drop you off at home.

**Detective Hale:** Okay but in between there, your son is accused of shooting in Freddie's vehicle. So what happened between that time?

**Gilbert:** I don't know the only thing I know is I heard them on the phone, and they were arguing, then I heard Freddie say I'm a shoot you. I'm going to kill you and all this and all that and they were arguing so then the phone got disconnected. The phone hung up so I tried to call my son back, and it kept going to the voicemail.

* * *

**Gilbert:** When Freddie left, when I seen Freddie leave, I put my son in the car, and I took him home.

**Detective Hale:** Right, so you took him home to where?

**Gilbert:** It's right over on right off of 14th Street. I don't know the exact address.

12

**Detective Hale:** At that time, did he mention anything about [inaudible]?

**Gilbert:** No.

**Detective Hale:** Okay.

**Gilbert:** My son was just saying that he was going to kill Freddie and all of that. He was upset and he was talking about he know Freddie know where he live at.

\* \* \*

**Detective Hale:** But at no time you didn't see a weapon?

**Gilbert:** No. I know that Freddie said that my son had a gun.

**Detective Hale:** Okay.

**Gilbert:** He said my son had a gun 'cause . . .

**Detective Hale:** And when did Freddie say that?

**Gilbert:** I talked to Freddie 'cause I told my son, I said let me speak to Freddie. Let me talk to Freddie because I was trying to talk common sense to them because they kept arguing so then Freddie going to say yeah this n\*\*\*\* he going to pull a gun and all of this and all of that so after that [inaudible].

**Detective Hale:** So did Freddie say your son Durrell shot at him?

**Gilbert:** Yes, Freddie did say that he shot in his truck.

ECF 1-2 at 127-130.

On August 14, 2017, the Marion Superior Court ordered that "witnesses in this matter may not be in the courtroom during the testimony of any other witness. Witnesses are further ordered that they may not discuss anything regarding their testimony with any other witness either inside or outside the courtroom." ECF 16-5 at 150. On August 15, 2017, the prosecution notified the court that Crain had violated the

order. In a recorded jail call, Crain had spoken with his grandmother in an effort to

inform his mother about the victim's testimony and to instruct her how to testify. ECF

16-2 at 177-87. Crain had used another inmate's PIN to make the call about 5:30 p.m. on

the previous day. *Id.* On a subsequent call, Crain's grandmother confirmed that she had

spoken with Crain's mother. *Id.*

When the prosecution brought to the court's attention a possible violation of the

court's separation of witnesses order, the judge had a discussion with Crain to explore

what had happened.  Here's what Crain told the court:

> I really need her to come do her testimony what she told the detective.
> Which the detective already got written down what she had told him. So I
> said I need you to basically just tell him exactly what you told him when
> he took his interview with you. That's what I need you to say. That's what
> I need her to say because Freddie kind of said like that you heard his gun.
> That I pulled out a gun when you was right there. You told the detective
> in your interview that you didn't see any gun basically, you know. So I
> didn't tell my mother that. I didn't tell my grandmother to tell her that.
> But I just told my grandmother just to basically just tell her to say what
> she told the detective in her interview. That's all I said.

*Id.* The trial court observed that, in the recorded call, it had specifically heard Crain tell

his grandmother, "Let [Crain's mother] know what [the victim] said she seen." *Id.* The

trial court found that Crain had violated the court's separation of witnesses order and

therefore excluded Crain's mother as a witness. *Id.*

At the post-conviction stage, Crain's mother testified as follows:

**PCR Counsel:** On October 9, 2016, do you recall receiving a phone call
from your son?

**Gilbert:** Yes, I do.

**PCR Counsel:** And can you describe what you heard when you answered the call?

**Gilbert:** Yes. Well, I was home cooking and I answered the phone and it was my son. And he was crying. And so, I asked him what was wrong. So he kept crying and I heard Freddie in the background, cussing and stuff. And so I told my son to put Freddie on the phone. So I asked Freddie what was going on. So Freddie was like, this –

* * *

**Gilbert:** So then after he told me that about – he was cussing and he called my son a n***** and all that. So then I said, Freddie, I said, okay. I said, okay. I said everybody calm down. I said someone has to have common sense. So I asked him to please drop my son off at my house. So when I looked up, Freddie was pulling up in front of my apartment building where I lived at. And my son was getting out the car, out of his truck. And I had went to the door. And so my son was fussing. They was fussing passing words. So my son like turned around like he was going back. And so I told my son, I said, "Come over here." Because I was cooking dinner for my daughter and my son-in-law at the time because they was getting married. And so I turned my food off and I took my son home. And Freddie pulled off after that, after my son came into my apartment building.

**PCR Counsel:** And is it true during that initial call that you heard Freddie threaten to kill him?

**Gilbert:** Yes. Yes, sir.

**PCR Counsel:** Did you see your son with a fire—

**Gilbert:** No, sir.

* * *

**Prosecutor:** Ms. Gilbert, I couldn't quite hear your answer when the attorney just asked you did you see your son with --- He said, did you see your son with something and then you answered. Do you remember what he asked or how you answered?

**Gilbert:** I told him, no, sir.

15

> **Prosecutor:** Did you say no, you don't remember?
>
> **Gilbert:** No. No. I didn't say I don't remember. I said, no, sir, I did not see him with anything.

ECF 16-9 at 40-49. Crain testified that he was not sure whether he would have called her as a witness at trial. *Id.*

The Indiana Court of Appeals rejected this claim, finding a lack of prejudice. ECF 15-16 at 12-14. The appellate court observed that trial counsel argued that the jail call did not violate the separation of witness order and that Crain did not deny understanding the order when addressing the trial court. *Id.* The appellate court further observed that Gilbert's testimony was largely cumulative of the victim's testimony and that Gilbert was not present when the shooting occurred. *Id.*

To be sure, the appellate court's analysis on this issue was threadbare. Nonetheless, after reviewing the record, I cannot find that the State court made an unreasonable determination on the finding of prejudice. Crain argues that he would have benefitted from his mother's testimony that she heard the victim say he would kill Crain, that she asked the victim to take Crain home, and that she did not see him with a gun. However, Crain's mother testimony could have been found to lack credibility given her relationship with her son and Crain's efforts to persuade his mother to testify consistent with her prior statements, which Crain concedes could have been conveyed to the jury through a cautionary instruction. ECF 1 at 5. His mother's prior statements also contained information that may have prejudiced Crain, including his excessive drunkenness, his behavior during his drunken episodes, the statement that Crain

16

wanted to kill the victim, and her reluctance to allow him to stay at her home during an important family event. Additionally, Crain's mother's testimony does not contradict the victim's most critical testimony for the kidnapping charge – that Crain fired his gun in the truck and that, shortly thereafter, Crain commanded the victim to drive him to his mother's house at gunpoint.

Crain also argues that his trial counsel did not adequately explain the separation of witnesses order to him. However, the record does not specifically detail what trial counsel told Crain about the order or Crain's understanding of the order when it was issued. The sole testimony on these points is as follows:

> **PCR Counsel:** Did you understand telling your grandmother to convey to your mother that she needed to be there the next day would violate a separation of witnesses?
>
> **Crain:** No, sir.
>
> **PCR Counsel:** Had it been explained to you at all that you shouldn't talk to your grandmother?
>
> **Crain:** No, sir.

ECF 16-9 at 10-11. Significantly, the trial court did not exclude Crain's mother as a witness simply because Crain had spoken with his grandmother on the phone or because he had asked for his mother to appear at trial. Instead, it was Crain's blatant violation of the separation of witnesses order—telling his mother (through his grandmother) what the victim testified to—that caused the trial judge to exercise her discretion and exclude Crain's mother as a witness.  Crain has not demonstrated deficient performance or prejudice with respect to trial counsel's explanation of the

separation of witnesses order. Therefore, the claim that trial counsel provided

ineffective assistance with respect to the exclusion of Crain's mother as a witness is not

a basis for habeas relief.

**3.  Ineffective Assistance of Trial Counsel – Amended Information**

Crain argues that trial counsel provided ineffective assistance by failing to

request a continuance when the prosecution amended the information. He maintains

that the failure to request a continuance waived the issue for appellate review and

deprived him of an opportunity to prepare to cross-examine the victim. He further

maintains that the amendment dissuaded him from testifying at trial.

Prior to opening statements, the prosecution moved to amend the information on

Count I as follows:

> **Original:** On or about October 9, 2016, Durrell T. Crain, while armed with
> a deadly weapon, to-wit: a handgun did knowingly remove Freddie
> Hollis by force or threat of force from one place to another, to wit: **21st St.
> and Arlington Avenue** to Durrell Crain's mother's house.

> **Amendment:** On or about October 9, 2016, Durrell T. Crain, while armed
> with a deadly weapon, to-wit: a handgun did knowingly remove Freddie
> Hollis by force or threat of force from one place to another, to wit: **near
> 30th St. and Franklin Road** to Durrell Crain's mother's house.

ECF 16-5 at 19-20, 141-42 (amended language in bold). After the trial court swore in the

jury, trial counsel objected on the basis of timeliness but when the court asked how he

would be prejudiced by the amendment, he didn't have a particularly good answer.

ECF 16-2 at 23-28. The trial court allowed the amendment but offered a continuance. *Id.*

Trial counsel declined, suggesting that the victim had been inconsistent with respect to

the route and that he could impeach the victim either way. *Id.* At the post-conviction

stage, trial counsel testified that he declined a continuance based on his understanding that Crain did not want a continuance and that he could proceed to trial. ECF 16-9 at 25. The Indiana Court of Appeals rejected Crain's argument, finding no deficient performance based on trial counsel's post-conviction testimony. ECF 15-16 at 11-12.

After reviewing the record, I cannot find that the State court made an unreasonable determination on this claim. In his traverse (ECF 21 at 26), Crain concedes that he instructed trial counsel that he did not want continuances at the outset of his criminal case, and a client's express instructions are a material factor in assessing a trial counsel's performance. *See Schriro v. Landrigan*, 550 U.S. 465, 476-77 (2007) (State court reasonably determined that trial counsel was not ineffective for failing to present mitigating evidence because the defendant refused to allow it); *Wallace v. Davis*, 362 F.3d 914, 920 (7th Cir. 2004) (same). The trial record also includes several letters to the trial court spanning from March to July 2017 complaining about the continuances agreed to by trial counsel and asserting his right to speedy trial. ECF 16-5 at 83-97, 127-38. Given Crain's repeated demands for an immediate trial and no further continuances, any claim that his lawyer was ineffective for failing to continue the case has to be met with a healthy dose of skepticism. What's more, it appears that the State court reasonably credited trial counsel's representations that he believed he could adjust his strategy to the amended indictment and proceed to trial without a continuance.

With respect to prejudice, Crain maintains that the failure to request a continuance resulted in three principal harms. First, he maintains that it waived an appeal issue of whether the amended indictment should have been allowed. However,

Crain provides no legal argument suggesting that he would have prevailed if he had raised the issue on appeal. Second, Crain maintains that the failure to request a continuance resulted in insufficient time to prepare to cross-examine the victim, but he offers no explanation as to how additional preparation would have resulted in a more favorable cross-examination. To the contrary, it does not appear that the amendment had any significant effect on the prosecution's case or the victim's testimony. As noted by the prosecution, the intersections of 21st Street and Arlington Avenue and of 30th Street and Franklin Road were both part of the single continuous route that Crain and the victim took from Ford's house to Crain's mother's house, and the kidnapping arguably began before they reached either of these intersections when Crain began handling the gun and refused to exit the victim's truck on I-70.

Third, Crain maintains that the amendment dissuaded him from testifying at trial. He represents "this amended location ultimately stopped him from testifying because they never went to 30th and Franklin and it would have made him look like he was lying, and [he] wouldn't have been credible due to his criminal history." ECF 1 at 8. This explanation is strange because, even without the amendment, Crain's account would have contradicted the information and the victim's testimony at numerous material points.[2] For example, Crain would have denied that he had a handgun, that he used it to threaten the victim, and that he fired the handgun in the victim's truck. He

---

[2] The State court record does not contain the testimony that Crain would have provided at trial had he decided to testify. However, Crain has attached a declaration to his traverse in which he provides his account of the kidnapping incident, and I assume that he would have testified consistent with this declaration. ECF 23-1 at 5-8.

would have suggested that the bullet hole in the dashboard was caused by the victim's father who previously owned the truck. Against this backdrop, it is unclear why a disagreement with the precise route taken by Crain and the victim would have dissuaded him from testifying.

Moreover, testifying at trial would not necessarily have benefitted Crain. As he concedes, the prosecution would have likely impeached him with his criminal history. Testifying would have exposed him to cross-examination and attacks on his character and credibility. He may have been asked about potentially prejudicial topics, including his alcohol consumption that day and prior interactions with the victim that led to the practice of the victim routinely frisking Crain before allowing him into his car. The jury may have disapproved of Crain's behavior and interactions with his elderly cousin as he went to visit an ailing friend. Additionally, the prosecution may have seized on any number of Crain's misstatements to discredit his broader narrative or to bolster their case. The prosecution may have also called rebuttal witnesses to discredit Crain's testimony. Notably, the prosecution had listed three members of the Ford family as witnesses.[3] ECF 16-5 at 63.

In sum, I cannot find that the State court made an unreasonable determination on trial counsel's performance in failing to request a trial continuance, and Crain has not demonstrated prejudice. Consequently, the claim that trial counsel failed to request a continuance following the amended information is not a basis for habeas relief.

_____

[3] That said, the victim testified that one of these witnesses had died by the time of trial. ECF 16-2 at 60.

**4.  Ineffective Assistance of Trial Counsel -- Dara Chesser**

Crain argues that he is entitled to habeas relief because trial counsel elicited testimony from Dara Chesser about why Crain's clothes were located at the county jail. He maintains that Chesser's response caused him prejudice by implying that he remained in custody in May 2017, months after his arrest in October 2016.

At trial, Crain's defense counsel called Dara Chesser as a witness. ECF 16-2 at 191-93. She testified that she worked as an investigative paralegal at the Marion County public defender's office. *Id.* On May 17, 2016, she located and photographed clothing at the county jail. *Id.* She laid the foundation for the photograph's admission and identified the clothing as belonging to Crain. *Id.* Trial counsel then asked her a final question before submitting the photographs into evidence:

> **Trial Counsel:** If you know, typically, why would someone's clothes be at [the county jail]?
>
> **Chesser:** Typically, the clothing that is held in property is what they came into the jail wearing?

*Id.* Following Chesser's testimony, a juror submitted a question for Chesser, but the trial court did not ask it due to the joint objection of the parties. The question was, "Why was the clothing not processed until May?" ECF 16-12 at 31.

At closing, trial counsel argued as follows:

> Let's talk about when they get to [Crain's] house. Now, you heard Officer McWhorter. On direct, he says he sees this door damaged. But, on cross, he says, I parked the car on the left. I go immediately to the back of the house. Detective Hale says it's a duplex. This house is on the right. So he couldn't have seen the door except when [Crain] comes out kicking the door. Why is that important? Well, it's important for the same reason that, you know, I showed you what he was wearing that night. That 911 call, it

22

means nothing. As you see, [Crain's] not wearing the same clothes that this person is describing in the 911 call. You know, those are the clothes that are in his property at the jail. That's what he's wearing. Not the white long john shirt with blue jeans; black shirt, black pants, black shoes. So this 911 call is meaningless.

ECF 16-2 at 210-11.

At the post-conviction stage, Crain argued trial counsel introduced testimony from Chesser that Crain's clothing remained at the county jail until May 2017, which allowed the jury to infer that he remained in custody. He argued that the record contained no other explanation as to why his clothes would have remained at the county jail and that he could have presented similar evidence through other sources. At the post-conviction hearing, trial counsel testified as follows:

**PCR Counsel:** During the discovery process, you also became aware that [Crain] was saying that he wore different clothes than were described in the [dispatch records]; is that correct?

**Trial Counsel:** Yes, sir.

**PCR Counsel:** And what did you do with regard to that information?

**Trial Counsel:** I sent my paralegal over to photograph his clothing. And I got a picture of his booking photo. And I sent it to the prosecutor.

**PCR Counsel:** In fact, the [dispatch records] described the person who was firing shots on East 12th Street was wearing a white shirt. And the clothes that [Crain] was arrested in, he was wearing a black shirt; is that correct?

**Trial Counsel:** Yes, sir.

**PCR Counsel:** And when you sent your investigator over to do that, she had to go to [the county jail] to photograph those clothes; is that correct?

**Trial Counsel:** Yes, sir.

**PCR Counsel:** And you then introduced that through her testimony at trial.

**Trial Counsel:** I believe I did.

**PCR Counsel:** Did you make any attempts to limine either cross or the information that the clothes were at the jail because he was still incarcerated?

**Trial Counsel:** I did not.

**PCR Counsel:** In fact, you asked, "If you know, typically, why would someone's clothes be at [the county jail]? Is that correct?

**Trial Counsel:** Honestly, I'm not sure.

**PCR Counsel:** Did you consider trying to limine out the fact that he was still incarcerated.

**Trial Counsel:** I did not.

\* \* \*

**PCR Counsel:** You did not depose any of the officers?

**Trial Counsel:** I did not.

**PCR Counsel:** Was there any strategic reason not to?

**Trial Counsel:** I guess other than to have them rehearse their testimony, no.

**PCR Counsel:** And so going into trial, you did not know whether they would back up or corroborate Mr. Crain's assertion that he was wearing a black shirt, not a white shirt at the time of his arrest?

**Trial Counsel:** No.

\* \* \*

**Prosecutor:** As far as taking any pretrial depositions of the officer, did you know what they were going to say from the discovery that the State provided?

**Trial Counsel:** I thought I had a good grasp on what they would say. Just kind of based on the situation. I didn't think that they needed to be deposed.

**Prosecutor:** Did it really matter whether you knew if they were going to say that he was wearing a black shirt or a white shirt?

**Trial Counsel:** It mattered to Mr. Crain. It mattered to him. I understood why it mattered to him. You know, I had my paralegal do the due diligence to kind of figure out what he was wearing. And me and the prosecutor kind of went back and forth about it. So I do think it mattered at least somewhat.

**Prosecutor:** But you didn't need to know that in advance, right?

**Trial Counsel:** From the officers, you mean?

**Prosecutor:** Exactly.

**Trial Counsel:** I didn't because I thought we had what the clothes were. So I didn't really think  I needed to get their corroboration about that, if you will.

ECF 16-9 at 16-32.

The Indiana Court of Appeals rejected this argument, noting the lack of any mention that Crain remained in custody when Chesser photographed his clothing. ECF 15-16 at 14-15. As a result, the appellate court did not find deficient performance or prejudice. *Id.*

After reviewing the record, I cannot find that the State court made an unreasonable determination on this claim. According to trial counsel, it was important to Crain that trial counsel highlight the discrepancy between the description of the shooter during the 911 call regarding the shots fired near Crain's residence and the clothing worn by Crain during his arrest. The record reflects that trial counsel opted to

present this discrepancy by presenting photographs of the clothing through his investigator rather than officer testimony because he did not know how they would respond if asked about Crain's clothing. It further reflects that he did not depose the officers because he generally knew what they would say from reviewing discovery and because he did not want to give them a chance to rehearse their testimony. And, prior to asking the final question during direct examination of Chesser, trial counsel needed to tie the Crain's clothing to the date of his arrest, and the final question did just that. Based on the foregoing, it appears that trial counsel's presentation and examination of Chesser amounted to a reasonable strategic decision.

Nor can I find that the State court made an unreasonable determination on prejudice, which Crain framed on post-conviction appeal as the jury learning that he remained at the county jail at the time of trial.[4] A juror would have had to make two inferences to reach this conclusion: (1) that Crain was still at the jail in May 2017 because Crain's clothing was at the jail in May 2017; and (2) that Crain was detained at the jail in August 2017 at the time of trial because Crain was at the jail in May 2017. The trial record contains no evidence to support either of these inferences, and the prosecution did not raise these points at closing. The unasked juror question reflects that one juror engaged in a line of reasoning that could have led her to these inferences,

---

[4] Crain's argument in the habeas petition differs slightly, asserting that the prejudice was that the jury learned that he was at the county jail months after his arrest in May 2016, three months before trial. ECF 1 at 14-15.

but there is no indication that any juror concluded that Crain remained at the jail or that it played a meaningful role in the verdict.

Further, Crain does not explain why this information would be prejudicial. In a related context, the Seventh Circuit addressed the issue:

> We find the case law regarding the practice of requiring defendants to wear prison attire at trial to be distinguishable. We agree that Johnson may have been somewhat prejudiced by the fact that the jury learned that the calls were recorded while he was in jail. However, the occasional reference to the fact that Johnson had at some point been in jail is quite different than the constant reminder of the accused's condition implicit in such distinctive, identifiable attire that underlies the injustice inherent in requiring a defendant to stand trial in prison garb. The Supreme Court has found that the defendant's prison attire is likely to be a continuing influence throughout the trial and that requiring such attire during trial is thus likely to undermine the presumption of innocence and the defendant's right to a fair trial. Given that Johnson faced a much diminished form of prejudice, and that the district court had to weigh this prejudice against the probative nature of the recordings, we find that the court did not abuse its discretion in admitting the tapes.

*United States v. Johnson*, 624 F.3d 815, 821–22 (7th Cir. 2010).

In sum, Crain has shown only that trial counsel elicited relevant testimony that may have led one juror to reach a conclusion that may have resulted in a "diminished form of prejudice." Against the backdrop of the victim's uncontradicted testimony, the bullet hole in the dashboard, and the discovery of the handgun at Crain's residence, I cannot find that the State court made an unreasonable determination on prejudice. Consequently, this claim is not a basis for habeas relief.

### 5.  Ineffective Assistance of Trial Counsel – Search Warrant

Crain argues that trial counsel provided ineffective assistance by failing to challenge the search warrant. He maintains that, if trial counsel had challenged the

27

search warrant, the trial court would have excluded the handgun from evidence.

"Probable cause exists when, considering all the circumstances, the affidavit sets forth

sufficient facts to induce a reasonably prudent person to believe that a search will

uncover contraband or evidence of a crime." *United States v. Sidwell*, 440 F.3d 865, 868

(7th Cir. 2006). "The affidavit is to be interpreted in a practical, common-sense manner."

*Id.*

Detective Hale prepared a search warrant affidavit in which he attested that he

had probable cause to believe that certain property was concealed in the residence of

"Durell T. Crain, BM, [DOB redacted], located at 6204 E. 12th Street." ECF 16-12 at 9. He

further attested that "the house faces South. Red brick with white trim, East half double,

the numbers 6204 on residence." *Id.* He attested to the following facts:

> Officers were dispatched on shots fired run on 10/09/2016. The victim in
> the shots fired advised that his cousin [Crain] fired a revolved at him just
> missing him as he and the suspect were in the victim's truck. The victim
> was driving at the time the shot was fired. The victim was driving at the
> time the shot was fired. The bullet just missed striking the victim. When
> the officers arrived, the suspect had fled the area at his residence located
> at 6204 E. 12th Street. The officers attempted to make contact with the
> suspect but no one was at home. Around 7pm on 10/09/2016, officers
> were dispatched to 6204 E. 12th Street on shots fired. The caller advised
> that a black male matching the suspect's description was seen firing a
> handgun and yelling around the residence located at 6204 E. 12th Street.
> Officers arrived and surrounded the residence. The suspect [Crain] exited
> the residence and surrendered to the officers. Detective [Hale] was
> notified and is now seeking a search warrant to recover the handgun in
> both crimes.

*Id.* At trial, Detective Hale testified he had started to prepare a search warrant for a

"barricaded subject" but then prepared a search warrant for the handgun after learning

that Crain had come out of the residence. ECF 16-2 at 167-68. The search warrant read as follows:

> To the Indianapolis Metropolitan Police Department.
>
> *  *  *
>
> You are therefore AUTHORIZED and ORDERED . . . to enter into the following described residence, to wit:
>
> 6204 E. 12th Street is the single family residence located on the eastside structure. It is a red brick double with white trim. Red shingles. The residence faces South.
>
> and thereby diligently search for the following described property to wit:
>
> Chrome revolver, bullets, holster, shell casings.

ECF 16-12 at 10.

According to the dispatch report, at 6:56 p.m., the 911 caller described a "B/M white long sleeve blue jeans at loc shooting his gun and kicking the door off its hinges . . . . Caller hears no further . . . Maroon Altima at LOC poss his." *Id.* at 12-13. The dispatch report lists the location as 6203 E. 12th Street. At 7:00 p.m., Officer Allen indicated, "subj poss inside 6204 E. 12th," and, at 7:04 p.m., the caller advised that "the subj might be at the other side of the duplex." *Id.* At 7:05 p.m., Officer Allen indicated that the subject came outside. *Id.* at 8:14 p.m., Officer Allen indicated that Detective Hale was enroute with the search warrant. *Id.* At 8:49 p.m., Officer Allen indicated that the handgun was found. *Id.*

I have also listened to the 911 call recording. State's Ex. 9. The caller advised that a police officer had been at the subject's residence earlier that day. *Id.* She advised that

the subject had torn the hinges of his outer security door by kicking it. *Id.* She identified

the subject as a black male, and she described his clothing and his vehicle. *Id.* She

initially provided 6203 E. 12th Street as the relevant address but had corrected it to 6204

E. 12th Street by the end of the call. *Id.*

At the post-conviction stage, Crain argued that the Detective Hale's affidavit was

conclusory and lacked facts suggesting that evidence would be found at Crain's

residence. ECF 15-13 at 19-22. Trial counsel testified that he examined the dispatch

report and search warrant but did not seek to suppress the handgun. ECF 16-9 at 21-22.

The Indiana Court of Appeals rejected the claim after noting that the search warrant

affidavit, the search warrant, and the dispatch report indicated that Crain and the

handgun were located at 6204 E. 12th Street and that the residence involved was a

duplex. ECF 15-16 at 10-11. As a result, the appellate court found no deficient

performance or prejudice. *Id.*

After reviewing the record, I cannot find that the State court made an

unreasonable determination on this claim. Crain argues that the warrant application

contained misleading or inaccurate information. For such challenges, the Seventh

Circuit has stated as follows:

> In *Franks v. Delaware*, 438 U.S. 154, (1978), the Supreme Court held that
> when a defendant makes a substantial preliminary showing that the police
> procured the warrant to search his property with intentional or reckless
> misrepresentations in the warrant affidavit, and such statements were
> necessary to the finding of probable cause, the Fourth Amendment entitles
> him to an evidentiary hearing during which he may challenge the
> constitutionality of the search. Where a hearing has been granted, as in
> this case, *Franks* instructs that if "at that hearing the allegation of perjury
> or reckless disregard is established by the defendant by a preponderance

of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded" The district court is therefore required to first determine whether the defendant has shown by a preponderance of the evidence that the false information was provided intentionally or recklessly, and if so, whether the affidavit, stripped of the false information, is nevertheless sufficient to establish probable cause.

*United States v. Spears*, 673 F.3d 598, 604 (7th Cir. 2012).

Crain focuses on the identification of 6203 E. 12th Street as the initial location to which police officers were sent the evening of October 9, 2016. Specifically, the dispatch report indicates the dispatcher sent police officers to 6203 E. 12th Street based on the report of a 911 caller. However, the 911 caller corrected the address to 6204 E. 12th Street before ending the call and specified that the subject had torn the outer security door from its hinges. Further, the dispatch report indicates that police were able to obtain more information after arriving at the location, including Crain leaving the home at 6204 E. 12th Street. According to Detective Hale's testimony, he did not prepare the search warrant for the handgun until Crain left the home and so he had ample facts to believe that a handgun could be found at the residence at 6204 E. 12th Street rather than 6203 E. 12th Street as initially reported by the 911 caller. As a result, the one-digit discrepancy between the initially reported address and Crain's address would have been unlikely to affect the probable cause determination.

Crain takes issue with Detective Hale representing that the 911 caller's description of him matched Crain, noting that the 911 caller described him as wearing a white shirt with blue jeans and that he was arrested in a black shirt with grey jeans.

Given the context of Detective Hale's representation, it appears that he is comparing the 911 caller's description to the descriptions of Crain obtained earlier that day. The police did not arrest Crain until after the 911 call, so Crain's clothing at the time of the arrest does not undermine Detective Hale's representation that the 911 caller's description of him matched Crain's description. It is not clear what descriptions Detective Hale relied on in preparing the affidavit, and it may be the case that the victim or Crain's mother had previously described Crain as wearing a white shirt with blue jeans. At minimum, the police would have known that Crain was a black male and that they had visited his house earlier that day.

Crain also maintains that Detective Hale lacked personal knowledge of his address or that he fled his home after the first 911 call. However, the record reflects that Detective Hale and Officer Mercer obtained this information from interviewing Crain's mother earlier that afternoon. ECF 1-2 at 125-41. Consequently, it does not appear that the search warrant affidavit contained information that was materially inaccurate or misleading.

In sum, a motion to suppress the handgun based on an argument that the search warrant was issued based on misleading or inaccurate statements would have been futile. As a result, I cannot find that the State court made an unreasonable determination in finding no deficient performance by Crain's counsel and no prejudice. Therefore, the claim based on counsel's failure to challenge the search warrant is not a basis for habeas relief.

6.  **Ineffective Assistance of Trial Counsel – Ballistics Expert**

Crain argues that he is entitled to habeas relief because trial counsel provided ineffective assistance by failing to obtain a ballistics expert and by failing to investigate surveillance videos from gas stations located along the victim's route.[5] He maintains that a ballistics analysis would have shown that Crain did not cause the bullet hole in the victim's truck by firing the handgun.

At the post-conviction stage, trial counsel conceded that he did not attempt to obtain expert analysis to determine the cause of the bullet hole. ECF 16-9 at 17-19. He further testified that he might have discussed surveillance recordings with his investigator and the prosecution, but he did not obtain them. *Id.* The Indiana Court of Appeals rejected the claim, noting that trial counsel largely testified that he could not recall his investigation of the surveillance video recordings. ECF 15-16 at 9-10. The appellate court further noted that, on post-conviction, Crain did not present a ballistics expert or any evidence relating to the surveillance video recordings. *Id.*

After reviewing the record, I cannot find that the State court made an unreasonable determination on this claim. To demonstrate prejudice on this claim, Crain must show that the proposed investigations would have resulted in evidence that would have been likely to change the outcome of his trial. He has not demonstrated the existence of any favorable surveillance recordings, and, on this record, it is entirely

---

[5] In the petition, Crain combines these arguments with the argument that trial counsel failed to depose police witnesses. However, I have already found that trial counsel's post-conviction testimony reasonably suggested that he had a strategic reason for declining to depose police witnesses, so I do not further address this argument.

unclear what conclusions a ballistics expert retained by Crain would have reached or

how such an expert would have testified at trial. Because Crain has not demonstrated

prejudice, the claim that trial counsel failed to investigate is not a basis for habeas relief.

### 7. <u>Trial Counsel – Cumulative Error</u>

Finally, Crain argues that, even if no individual error by trial counsel was

sufficiently prejudicial to warrant habeas corpus relief, the court should grant him relief

based on the cumulative prejudice of the errors. "[P]rejudice may be based on the

cumulative effect of multiple errors. Although a specific error, standing alone, may be

insufficient to undermine the court's confidence in the outcome, multiple errors

together may be sufficient." *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008).

I do not find that Crain has demonstrated any prejudice with respect to his

claims regarding trial counsel's failure to suppress the handgun and the failure to

investigate. He maintains that trial counsel failed to preserve for appeal the exclusion of

his mother's testimony and the amendment of the information, but he did not identify

any legal arguments that would have allowed him to prevail on appeal. And, as

previously noted, I am skeptical that there is any connection between Crain's decision

not to testify and the amendment of the information.

At times, Crain's proposals for what trial counsel should have done undercut

each other. For example, he proposes that trial counsel should have offered to present

his mother's testimony with a curative instruction explaining the jail call, but he also

asserts that suggesting that he remained in jail at the time of trial amounts to prejudice.

It is also unclear how trial counsel could have suppressed the handgun while also

presenting ballistics evidence to show that Crain did not shoot the truck using the handgun. Additionally, even if he had prevailed on appeal, Crain's mother saw only a portion of the incident and had substantial credibility concerns, and the prosecution would have likely elicited highly unfavorable testimony from her on cross-examination. Crain's testimony would have been similarly subject to unfavorable cross-examination and other impeachment tactics. I am not persuaded that the alleged errors, considered in their entirety or in any combination, resulted in prejudice without which the jury's verdict would have been different.

On post-conviction review, the Indiana Court of Appeals found that Crain had not demonstrated that the alleged errors considered together amounted to prejudice. ECF 15-16 at 15. Based on the foregoing, I cannot find that the State court made an unreasonable determination on cumulative error, and this claim is not a basis for habeas relief.

## Certificate of Appealability

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Crain to proceed further.

ACCORDINGLY:

The court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of

appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk

to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on January 3, 2024.

_/s/ Philip P. Simon_____
JUDGE
UNITED STATES DISTRICT COURT